No. 23-55742

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAINTERS AND ALLIED TRADES DISTRICT COUNCIL 82
HEALTH CARE FUND, a third-party healthcare fund;
ANNIE SNYDER, a California consumer; RICKEY D. ROSE,
a Missouri consumer; JOHN CARDARELLI, a New Jersey
consumer; MARLYON K. BUCKNER, a Florida consumer;
and SYLVIE BIGORD, a Massachusetts consumer,

*Plaintiffs-Appellees*,

v.

TAKEDA PHARMACEUTICAL CO.; TAKEDA
PHARMACEUTICALS USA, INC., formerly known as
TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.; and
ELI LILLY AND CO.,

*Defendant-Appellants.*

On Appeal from the United States District Court for the
Central District of California
Case No. 2:17-cv-07223, Hon. John W. Holcomb

## ANSWERING BRIEF [REDACTED]

R. Brent Wisner
Michael L. Baum
Harrison James
WISNER BAUM, LLP
11111 Santa Monica Blvd, #1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
mbaum@wisnerbaum.com
hjames@wisnerbaum.com

Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, LLC
1100 Poydras Street, #3525
New Orleans, Louisiana 70163
(504) 355-0086
ccoffin@pbclawfirm.com

*Attorneys for Appellees*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Painters and Allied Trades District Council 82 Health Care Fund ("Painters") does not have any parent corporation nor does any publicly held corporation own more than 10% of any stock.

April 4, 2024

Respectfully submitted,

R. Brent Wisner
Michael L. Baum
Harrison E. James
WISNER BAUM, LLP
11111 Santa Monica Blvd, #1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
mbaum@wisnerbaum.com
hjames@wisnerbaum.com

Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, LLC
1100 Poydras Street, #3525
New Orleans, Louisiana 70163
(504) 355-0086
ccoffin@pbclawfirm.com

*Attorneys for Plaintiff-Appellee Painters and Allied Trades District Council 82 Health Care Fund*

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .............................................................. v

INTRODUCTION ........................................................................ 1

ISSUES PRESENTED .................................................................... 4

STATEMENT OF THE CASE .............................................................. 6

    I.  The Fraud:  For Over a Decade, Takeda and Lilly Concealed the Risks of Bladder Cancer Associated with Actos to Sell More of It ........................................................................ 6

        A.  Safety Concerns Concerning Actos Caused Upjohn to Stop Developing Actos, But Takeda Pressed on and Conspired with Lilly to Lie About Upjohn's Withdrawal .......................... 6

        B.  From the Beginning, Takeda and Lilly Knew that Actos Posed a Bladder Cancer Risk, But They Did Not Warn .......... 8

        C.  Takeda and Lilly Begin to Promote Actos as a PPAR Alpha Agonist Until the FDA Indicated that PPAR Alpha Agonists Cause Bladder Cancer; Then They Lied to the FDA and Destroyed Evidence ................................... 9

        D.  After the Bladder Cancer Warning Scare, Takeda and Lilly Studied the Impact of a Warning on Actos Utilization ............................................................. 13

        E.  In 2005, New Data Raises Another Alarm about the Risk of Bladder Cancer, but Again, Takeda and Lilly Stonewall the FDA ................................................. 15

        F.  FDA Conducts an Independent Investigation and Forces Takeda to Start Warning about the Bladder Cancer Risk .... 17

ii

II. The Consequences: Concealment of the Bladder Cancer
Risk Allowed Takeda and Lilly to Sell Greater Quantities
of Actos ............................................................................... 18

    A. As Predicted, the Bladder Cancer Warning Caused Actos
Use to Plummet ............................................................... 18

    B. Independent, Peer-Reviewed Researchers Confirm the
Effect of the Bladder Cancer Warning on Actos
Utilization ....................................................................... 21

    C. Prescribers and Patients Express Wide-Spread Concern
About Bladder Cancer Following Public Disclosure ............. 22

    D. Econometric Modelling Establishes that, Had a Bladder
Cancer Warning Been Issued from the Outset, the Class
Would Have, on Average, Paid for 56% Fewer Actos
Prescriptions ................................................................... 23

III. The Lawsuit: Because of Takeda and Lilly's Civil RICO
Violations, the Class of TPPs Paid for Excess Prescriptions
of Actos ............................................................................... 27

SUMMARY OF ARGUMENT ................................................... 28

STANDARD OF REVIEW ........................................................ 34

ARGUMENT .......................................................................... 35

I. The District Court Correctly Held that Questions of Law and
Fact Common to the Class Predominate Over Questions
Affecting Only Individual Members ........................................ 35

    A. The District Court Correctly Determined that But-For
Causation Could be Established for an Individual Class
Member Using Common Evidence ....................................... 37

        1. The District Court Rigorously Considered Dr.
Comanor's Econometric Modeling in Assessing
Predominance ............................................................. 43

2. Appellants' Criticisms of Dr. Comanor's Econometric Model Were Considered and Rejected by the District Court Pursuant to Its Broad Discretion ........................... 47

3. The District Court Carefully Considered the Evidence Relating to Appellants' Affirmative Defense and Held That the Common Issues Still Predominated ................... 55

B. The District Court Correctly Determined that Uninjured Class Members Can be Identified and Excluded in a Way that Does Not Implicate Overwhelming Individual Issues ... 60

C. The District Court Correctly Held that Damages Are Susceptible to Classwide Proof ............................... 64

1. Offsetting Damages Is Not Required Under RICO ......... 64

2. There Is No Abuse of Discretion in the District Court's Finding that Damages Are Susceptible to Classwide Proof, Consistent with Plaintiffs' Theory of Liability ....... 68

II. The District Court Correctly Held that a Class Action Is Superior to Thousands of Individual Actions ............................. 72

III. RICO Claims Against Lilly for Engaging in an Enterprise with Takeda Are No Impediment to Class Treatment ............... 73

CONCLUSION ........................................ 74

CERTIFICATE OF COMPLIANCE ......................................... 76

CERTIFICATE OF FILING AND SERVICE ........................................ 77

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................... 35

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ......................................................... 36, 44

*BCS Servs., Inc. v. Heartwood 88, LLC*,
637 F.3d 750 (7th Cir. 2011) .............................................. 71

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) .............................................................. 71

*Bridging Communities Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) ............................................ 57

*Canyon Cty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) .............................................. 37

*Carter v. Berger*,
777 F.2d 1173 (7th Cir. 1985) ............................................ 67

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................ 68, 70

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .............................................. 44

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ............................................... 36, 43, 59

*F.T.C. v. Figgie Int'l, Inc.*,
994 F.2d 595 (9th Cir. 1993) .............................................. 66

*Haslund v. Simon Prop. Grp.*, Inc.,
378 F.3d 653 (7th Cir. 2004) .............................................. 71

*Hilario v. Allstate Ins. Co.*,
No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024) ................... 73

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
No. 6:11-MD-2299, 2014 WL 5461859 (W.D. La. Oct. 27, 2014)...........1

*In re Actos® (Pioglitazone) Prod. Liab. Litig.*,
No. 6:11-MD-2299, 2014 WL 12776173
(W.D. La. Sept. 5, 2014) .................................................................. 15, 16

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
915 F.3d 1 (1st Cir. 2019)........................................................ 41, 58, 61

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. &*
*Antitrust Litig.*,
No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550
(D. Kan. Mar. 10, 2020)................................................................... 61

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008),............................................................. 45

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)............................................................... 51

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019)..................................................... 51

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 51 (1st Cir. 2013)................................................ 38, 39, 40, 41

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 60 (1st Cir. 2013)................................................ 38, 41, 54, 55

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 21 (1st Cir. 2013)................................................ 38, 39, 71, 73

*In re Niaspan Antitrust Litig.*,
464 F. Supp. 3d 678 (E.D. Pa. 2020).................................................. 62

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ......................................................... 51

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ........................................................... 68

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ........................................................ 35, 68

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) .............................................................. 59

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...................................................... passim

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*,
    943 F.3d 1243 (9th Cir. 2019) .................................................... passim

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*,
    796 F. App'x 919 (9th Cir. 2019) ........................................... 27, 58, 65

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) .............................................................. 44

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ........................................................................... 67

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015) ...................................................... 42, 54, 58

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018) ........................................................ 30, 57

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .................................................................... passim

*UFCW Loc. 1776 v. Eli Lilly & Co.*,
    ("Zyprexa"), 620 F.3d 121 (2d Cir. 2010) ........................................ 53

*Ukwuoma v. Marine*,
    907 F.2d 155 (9th Cir. 1990) .............................................................. 71

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ........................................................... 35

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023)..............................................30, 56, 58, 59

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..............................................................................44

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000).................................................................57

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ..............................................................34

## Statutes

18 U.S.C. § 1962 .............................................................................36, 37

18 U.S.C. § 1964 .....................................................................36, 37, 64, 65

18 U.S.C.A. § 1961.................................................................................65

## Other Authorities

2 Newberg and Rubenstein on Class Actions § 4:50 (6th ed.)................63

2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed.)...............70

2 Newberg on Class Actions § 4:49 (5th ed. 2012)................................35

## INTRODUCTION

Takeda Pharmaceuticals ("Takeda") and Eli Lilly & Company ("Lilly") sold greater quantities of Actos by fraudulently concealing a bladder cancer risk. As the Multidistrict Litigation ("MDL") Court that presided over Actos litigation for five years explained: "[F]rom the beginning of their commercial alliance, Takeda and Lilly were aware of the possibility that Actos® posed an increased risk of bladder cancer" and they intentionally "deprived physicians of the information necessary to perform their function in our medical care system" by "effectively [writing] off an identifiable and significant, and perhaps, the most vulnerable segment of the population of diabetics" through "a concerted, long-term effort to conceal and obfuscate information about the true risk of bladder cancer . . . all in the blind pursuit of profit." *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 6:11-MD-2299, 2014 WL 5461859, at *24 (W.D. La. Oct. 27, 2014) (emphasis added).

This is why a unanimous jury awarded $9 billion in punitive damages ($6 billion against Takeda and $3 billion against Lilly). It is also why Takeda and Lilly paid over $2.4 billion to settle personal injury claims with those diabetics that developed bladder cancer.

1

But, here is the rub. For the decade Takeda and Lilly actively concealed the bladder cancer risk, they exposed "more than 10 million" Americans to a carcinogen without their consent and *netted $24 billion* in the process. 2-SER-412–413. By violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Takeda and Lilly made jaw-dropping profit, selling more Actos than they ever would have had they been honest. We know this because market studies Takeda and Lilly conducted revealed the negative impact a bladder cancer warning would have on Actos use in the early 2000s; an impact borne out when the truth emerged in 2011 and the U.S. Food and Drug Administration ("FDA") forced a label change, causing Actos use to *plummet*. Peer-reviewed literature, econometric regressions, and a "mountain" of other evidence, *see* 1-ER-31, make it clear that Takeda and Lilly violated RICO and made billions from selling excess Actos prescriptions. Third-party payer ("TPPs") insurance companies around the country, like the union health fund leading this case, i.e., Painters, footed much that bill.

This lawsuit attempts, in part, to correct the impact of this fraud by recovering a portion of the money that Takeda and Lilly obtained from TPPs as a result of their RICO violations. And, practically, the only

way this case can make that correction is within a class setting.

In this appeal, Takeda and Lilly claim the district court ("DC") abused its discretion in finding that common issues predominated and that a class action is superior. Relying on the nature of medical decision making, i.e., the doctor-patient relationship, they argue that it is impossible to prove causation without implicating an endless assortment of individual issues. In effect, Takeda and Lilly argue that no class action involving pharmaceutical fraud under RICO is *ever* possible. But this argument goes too far and, on closer inspection, holds little water, especially on this record. Here, the DC scrutinized the volumes of evidence presented by Plaintiffs and, after considering and rejecting the litany of "challenges" raised by Defendants, concluded that the preponderance of the evidence demonstrated that common issues predominate and that the class modality is superior. Takeda and Lilly's challenges, at base, boil down to misstatements of the record and disagreement with how the DC weighed that record. That is not enough to meet the demanding burden of establishing an abuse of discretion. If there was ever a quantity-effect RICO case that warrants certification, this is it. The certification order should be affirmed.

## ISSUES PRESENTED

I.  In finding that common issues of law and fact predominate over individual issues:

    a.  Whether the DC conducted a "rigorous analysis" when it scrutinized and weighed the evidence and systematically rejected Appellants' challenges as "unpersuasive."

    b.  Whether, in assessing but-for causation:

        i.  The DC abused its discretion in finding that a preponderance of the evidence demonstrated that common issues predominate, based on a "mountain" of evidence consisting of Appellants' own internal studies, peer-reviewed literature, econometric regression models, and other admissions and evidence.

        ii.  The DC abused its discretion in holding that a theoretical affirmative defense, i.e., the possibility that some doctors might have prescribed Actos regardless of the bladder cancer risk, did not defeat predominance in the absence of evidence that such a defense was viable or even existed.

    c.  Whether, in assessing injury, the DC abused its discretion in

concluding that the proposed method to identify uninjured class members does not implicate overwhelming individual issues because it uses objective criteria that can be easily ascertained within the claims databases.

    d.   Whether, in assessing damages:

        i.   The money lost as the result of a RICO violation must be reduced by what might have happened to that money in the absence of the fraud, or whether RICO victims are entitled to full recovery of all defrauded money.

        ii.   The DC abused its discretion in concluding that damages are susceptible to being established with common proof consistent with Plaintiffs' theory of liability.

II.  Whether the DC abused its discretion in concluding that a class action is more manageable and more efficient than thousands of individual TPP lawsuits.

III.  Whether Lilly's role in the RICO enterprise renders class treatment improper.

## STATEMENT OF THE CASE

**I.    The Fraud:  For Over a Decade, Takeda and Lilly Concealed the Risks of Bladder Cancer Associated with Actos to Sell More of It**

**A.    Safety Concerns Concerning Actos Caused Upjohn to Stop Developing Actos, But Takeda Pressed on and Conspired with Lilly to Lie About Upjohn's Withdrawal**

In the 1980s, Takeda sought to expand its pharmaceutical presence in the United States by partnering with the Upjohn Company to develop Actos.  2-ER-78.  ███████████████████

█████████████████████████████████████████

███████████████████████  4-SER-514.  Takeda continued Actos development █████████████████████████████████

███████████████████████████████████████  5-SER-907.  This prompted Upjohn employees to express concern ███████

███████████████████████████  5-SER-905.

In 1996, ██████████████████████████████████████

███████████████████████  5-SER-892.  To address this, ████████████████████████████  4-SER-733.  Dr. Cohen developed the ███████████████████████████████████

█████████████████████████████████████████

6

███████████████████████████████████████ 5-SER-879–

880.  The theory, however, is a sham.  The Cohen Hypothesis could only

explain the formation of cancer caused by irritation from crystals

formed in the bladder, not transitional cell cancers observed in the

rodent bladders.  2-ER-81.  Moreover, bladder cancer was also observed

in *female* rats, which do not have the pH problem.  2-ER-81.

In December 1998, before Actos was approved, Takeda and Lilly

negotiated a partnership.  4-SER-738.  ██████████████████████

███████████████████████████ 5-SER-902–903.  However,

Takeda asked Lilly ████████████████████████████████

████████████████████████████████████

███████  5-SER-902–903.  Lilly agreed ████████████████

█████████████████████████████████████████████ 4-

SER-802.

Under the Co-Promotion Agreement, Takeda and Lilly agreed ██████

███████████████████████████████████████████

██████████████ 4-SER-746.  ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

7

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████ 4-SER-746, 753, 786,

793–794.  Following the seven-year copromotional period, ██

█████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████ 4-SER-758.

**B. From the Beginning, Takeda and Lilly Knew that Actos Posed a Bladder Cancer Risk, But They Did Not Warn**

Early on, Takeda and Lilly identified bladder cancer as a liability

risk.  For example, in a Power Point dated July 19, 1999, Lilly

addressed "Pioglitazone's Product Liability Risk" and identified

"bladder cancer" as one of the "Most Significant Adverse Events Risks

for Pioglitazone[.]"  3-SER-344.  "Liver Failure," "Cardiac Hypertrophy,"

and "Edema" were also identified as potential risks.  3-SER-344.  And

yet, in the July 1999 Actos label, while there were warnings for liver

failure, cardiac hypertrophy, and edema, there were none for bladder

8

cancer.  3-SER-331–332.[1]

**C. Takeda and Lilly Begin to Promote Actos as a PPAR Alpha Agonist Until the FDA Indicated that PPAR Alpha Agonists Cause Bladder Cancer; Then They Lied to the FDA and Destroyed Evidence**

Actos (pioglitazone) is a medication for type II diabetes.  Actos activates a receptor ("PPAR") in cells that makes them more responsive to insulin and able to absorb and process glucose.  2-ER-78.  Actos's primary competitor was Avandia.  Takeda and Lilly competed against Avandia by claiming that Actos, unlike Avandia, had the additional benefit of improving cardiovascular outcomes ███████████████ ████████████████████████████████████████████████ 5-SER-842.  Takeda and Lilly made this claim because, ██████████████ ████████████████████████████████████████████████ 5-SER-842.  Takeda even published literature touting these cardiovascular benefits because of PPAR alpha affinity.  3-SER-540–511.

In July 2002, FDA raised concern about bladder cancer and PPAR-

---

[1] The label mentioned bladder tumors in a rat study but disavowed any link to humans. 3-SER-334.  In 2011, a bladder cancer warning was added, 2-SER-131, and the current label contains a clear warning on the first page. 3-SER-416.

alpha agonists. 3-SER-321. The FDA conveyed that "the 'Cohen hypothesis' for bladder tumors … is not relevant" and the "agency is no longer satisfied that the tumor formation is a species specific finding[.]" 3-SER-321. FDA received data from a different company which showed bladder tumor formation in a similar "dual PPAR agonist" they were developing, and that the tumors were likely "the result of a class pharmacology[.]" 3-SER-321. This led the other company to stop developing the drug. Importantly, that company used Actos as a comparator in "a bladder tumor promotion study" and Actos "was shown to increase the formation of bladder tumors." 3-SER-321. The FDA raised concern that "the general population is not being adequately informed about the risks" and suggested that patients taking Actos "screen urine" for "bladder tumors[.]" 3-SER-319. The FDA asked Takeda "to consider a label change, as they feel that the current package insert does not adequately inform patients of the risk associated with bladder tumors." 2-SER-311.

Instead of acknowledging the bladder cancer issue, Takeda and Lilly stonewalled the FDA. They organized a high-level "Actos FDA Response Meeting" where they outlined a strategy they used to rebuff

similar concerns in Europe.  2-SER-311–313.  That strategy included

sticking ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████  5-SER-823–824,

830.

By January 2003, with pressure mounting, FDA asked Takeda and

Lilly to "propose nonclinical and clinical label language change to

address their concerns regarding the bladder."  2-SER-301–302.  So,

Defendants sketched out labeling positions.  2-SER-301–302.  The

opening position was to remove the sentence "[t]he relationship of these

findings in male rats to humans is unclear" and refuse any language

suggesting a clinical connection in humans.  2-SER-301–302.  If the

FDA rejected the opening proposal, they had four alternatives with

incrementally stronger language.  2-SER-301–302.  The "strongest"

alternative they would accept: "Rare cases of bladder cancer have been

reported in patients receiving ACTOS.  The relationship between

ACTOS and bladder cancer in humans is unknown."  2-SER-301–302.

Acutely aware that a bladder cancer warning might impact Actos

sales, Claire Thom, Takeda's Vice President of Research &

Development, emailed Dan Orlando, Takeda's Director of Actos Marketing, asking him to comment "on the *possible effect for the sales figures of Actos* in the US in each labeling scenario[.]" 2-SER-301. (emphasis added). Orlando responded, "[t]he decision was made that conducting market research on possible label language around bladder cancer would *risk public awareness*" so they did not have "a quantitative measure to gauge the impact of the suggested label changes on the sales forecast." 2-SER-301 (emphasis added). However, it was "obvious" that "the more onerous the clinical language the greater *the expected impact*." 2-SER-301 (emphasis added). Orlando concluded: "In Marketing's assessment any of the proposed changes which imply a clinical connection *would have an impact to sales*." 2-SER-301 (emphasis added). Thom agreed that a bladder cancer warning would cause decreased sales. : "Q. I mean, the wors[e] the language, the wors[e] effect on sales, right? A. Logical." 2-SER-307. Takeda also agreed it would have an "impact to sales." 2-SER-293.

Stonewalling worked. Takeda and Lilly evaded any meaningful label change by deceiving the FDA about Actos being a dual PPAR gamma/alpha agonist.

Takeda and Lilly, however, had a problem. They had marketed Actos as a dual PPAR gamma/alpha agonist for years. One consultant explained the issue to Takeda: "the FDA is thumping you with the thought that mixed agonists cause bladder cancer and we just spent the last 4 months fighting this[.]" 2-SER-298. "I don't think that marketing the mixed agonist stuff will in any way make up for … the potential losses from the 'cancer' stigmata that is surely to be used[.]" 2-SER-298. ██████████████████████████████████

███████████████████████████ 4-SER-735–736

### D. After the Bladder Cancer Warning Scare, Takeda and Lilly Studied the Impact of a Warning on Actos Utilization

At the end of 2003, Takeda and Lilly quietly studied how a bladder cancer warning would impact utilization. The first study was "Barriers to TZD Prescribing Qual Report[.]" 2-SER-214. Researchers conducted "in-depth telephone interviews" with primary care physicians ("PCPs") and endocrinologists. 2-SER-218, 281.[2] Physicians were presented with

---

[2] According to Takeda, ████████████████████████

████████████████████████████████████████

██████████████████████████ 4-SER-708, 715.

a hypothetical "new" product profile and "asked for their impressions and likelihood of use[.]" 2-SER-282. The profile presented included "[p]eriodic urinary monitoring … to detect hematuria (blood in urine)." 2-SER-282. Of the twelve physicians presented with the profile, four were "concerned about the underlying problem causing hematuria." 2-SER-283. After they were told the monitoring was due to potential bladder tumors, of "the 8 physicians who expressed initial interest" it "declined greatly among 6" and "slightly for 2 physicians[.]" 2-SER-283–284. For the "4 physicians initially concerned with hematuria, the risk of bladder tumors was serious enough that *all* felt they *would not use the product*[.]" 2-SER-283–284 (emphasis added).

The second study, in February 2004, involved a larger sample, and was called "Future of Diabetes[.]" 2-SER-140. The researchers conducted 50 focus groups with 462 physicians. 2-SER-142. Participants were presented with a product profile for a diabetes drug called "X" which included hematuria monitoring. 2-SER-172. The researchers noted that "[p]hysicians were divided in their levels of concern over a new product … that has periodic urinary monitoring required to detect hematuria (blood in the urine)." 2-SER-172.

14

However, "[o]nce told that the reason for the monitoring is due to bladder cancer risk, physicians considered it *a very significant deterrent to usage*[.]" 2-SER-172 (emphasis added). The data showed that 72% of PCPs and 83% of endocrinologists were significantly less likely to prescribe a diabetes drug with a bladder cancer risk. 2-SER-205.

### E. In 2005, New Data Raises Another Alarm about the Risk of Bladder Cancer, but Again, Takeda and Lilly Stonewall the FDA

In the "PROactive" clinical trial, fourteen people in the Actos group and five in the placebo group developed bladder cancer—a statistically-significant increase in bladder cancer. 3-SER-486. However, when the study was published, Takeda and Lilly reported *six* bladder cancer cases, as opposed to five, in the placebo group. 3-SER-497. The additional "tumor" in the placebo group, made the increased risk no longer statistically significant. The additional "tumor" was, in fact, benign and should not have been counted. 3-SER-486.

Around this same time, Takeda also performed a statistical analysis of the FDA's Adverse Event Reporting System database, which showed a signal for bladder cancer when comparing Actos to other drugs. *See In re Actos® (Pioglitazone) Prod. Liab. Litig.*, No. 6:11-MD-

2299, 2014 WL 12776173, at *7 (W.D. La. Sept. 5, 2014). However, Takeda edited the table to omit this statistical analysis from the reports provided to the FDA. *Id.*

Also, around this time, Takeda conducted an analysis of bladder cancer in the Kaiser Permanente Northern California (KPNC) database. *Id.* The analysis revealed a statistically significant increased bladder cancer risk for people taking Actos. *Id.*

In preparing to report the PROactive and KPNC results to FDA, Takeda executives commented that  5-SER-818. Anticipating FDA action, 5-SER-817. The most likely 5-SER-817.

In 2006, another FDA medical reviewer, Dr. Robert Misbin, attempted to expose the bladder cancer issue. *See* 3-SER-455, 469–472.

He noted that Takeda and Lilly resisted requests by the FDA to add bladder cancer language to the Actos label.  3-SER-470.  Regarding the PROactive data, Dr. Misbin noted that there were only five bladder cancers in the placebo group, not six, and when properly calculated, there was a *statistically significant tripling* of the risk.  3-SER-471. Takeda and Lilly largely ignored Dr. Misbin.  No bladder cancer warning was added to the label.

## F.  FDA Conducts an Independent Investigation and Forces Takeda to Start Warning about the Bladder Cancer Risk

On September 17, 2010, FDA announced it was investigating Actos for "an increased risk of bladder cancer."  2-SER-135.  On June 15, 2011, FDA found "that use of the diabetes medication Actos (pioglitazone) for more than one year may be associated with an increased risk of bladder cancer."  2-SER-131.  This was followed, on August 4, 2011, with the addition of a bladder cancer warning to the Actos label.  2-SER-128.  The current Actos label states, on the first page: "Bladder cancer:  May increase the risk of bladder cancer."  3-SER-416.

## II. The Consequences: Concealment of the Bladder Cancer Risk Allowed Takeda and Lilly to Sell Greater Quantities of Actos

### A. As Predicted, the Bladder Cancer Warning Caused Actos Use to Plummet

Takeda and Lilly were able to sell more Actos by concealing the

bladder cancer risk—a point Lilly conceded under cross examination:



4-SER-704.

This proposition is supported by, as the DC characterized it, a

"mountain of evidence." 1-ER-31. The most feature of that mountain:

Use of Actos in the United States plummeted as the bladder cancer risk

became known.



4-ER-547; s*ee also* 3-ER-244-248 (showing similar drops in Actos utilization); 4-ER-545–552 (same). A similar pattern was observed for Painters' payments for Actos. 3-ER-246; 4-ER-552.

Takeda studied how the bladder cancer warning impacted sales. Takeda conducted a "situational analysis of prescription trends" in response to the bladder cancer reaction and presented it to Takeda's "senior management." 2-SER-126; 4-SER-545. It states that ███

███████████████████████████████████████████████

███████████████████████ 4-SER-548 (emphasis added).

█████████████████████████████████████████

███████████████████████████████████████████



██████████████████████████████ 4-SER-555–557. ███████████████████████

█████████████████████████████████ 4-SER-557–566. ███████████████████

██████████████████████████████████ █████████████████████████████ 4-SER-568. █████████████ ████████████████████████████████ █████████████████████████████ 4-SER-568. ██████████████████████████████ 4-SER-570.

Takeda also conducted a "quick quantitative study" to "analyze awareness and impact of the bladder cancer news[.]" 2-SER-116. Takeda interviewed "248 PCPs and ENDOs" and learned that "[a]wareness of the news that the use of Actos may be associated with an increased risk of bladder cancer is nearly 90%." 2-SER-116.

By January 2012, ████████████████████████████ ██████████████████████████ 4-SER-540. Indeed, even Takeda's readjusted October 2010 and January 2011

forecasts fell short.  4-SER-540.

### B.  Independent, Peer-Reviewed Researchers Confirm the Effect of the Bladder Cancer Warning on Actos Utilization

This conspicuous decline in Actos utilization prompted independent researchers to study it.  A group of Harvard researchers estimated the "effects" of various safety warnings on "utilization and reimbursed costs of" Actos "in state Medicaid programs[.]"  2-SER-94.  The researchers conducted a time-series regression "to examine the effects of the FDA actions on quarterly market shares according to use[.]"  2-SER-96.  "This method can provide *strong evidence of causal effects* because it takes into consideration the question of whether an intervention causes abrupt and measurable interruptions in the pre-existing trend."  2-SER-96 (emphasis added).  Their data confirms Actos use plummeted because of the bladder cancer warnings.  2-SER-98.  They concluded: "[Actos] use dropped sharply … *due* to accumulating evidence of an increased risk of bladder cancer[.]"  2-SER-103 (emphasis added).

This observation was also noted by FDA researchers, who observed Actos prescriptions dropped in 2012, following the bladder cancer warning by the FDA, "highlighting the impact of potential safety

21

concerns." 3-SER-355, 358. Similar independent and peer-reviewed studies looking at Actos utilization in Taiwan, Korea, and Australia, each showed decreased Actos utilization in response to a bladder cancer warning. 2-SER-83("[A] substantial reduction in its use was found after the bladder cancer risk warning in 2010[.]"); 2-SER-68 ("Regulatory actions, such as the pioglitazone [Actos] safety warning . . . have been shown to reduce the likelihood of prescribing the relevant drug."); 2-SER-59 (noting Actos decline in Australia).

### C. Prescribers and Patients Express Wide-Spread Concern About Bladder Cancer Following Public Disclosure

Immediately following the FDA's 2010 safety alert, Takeda was flooded with requests for information. Takeda graphed the number of physician information requests ("PIRs") related to bladder cancer between July 2010 and September 2011. 2-SER-52. There were no PIRs prior to September 2010. However, immediately following the June 2011 announcement, PIRs regarding bladder cancer shot up to over 450 a week. 2-SER-52. Between September 2010 and September 2011, Takeda received over 2,300 PIRs from physicians. 2-SER-34. Numerous prescribers expressed:

"Dr. is still concerned about actos and the risk of bladder cancer. … He is worried that 'I' and 'Takeda' may be downplaying the risk and doesn't want to be burned."

"[A] pharmacist would not give to a patient due to the concern with bladder cancer[.]"

"[A] PA at Dr Ian Galleger's office informed him that he will no longer be writing scripts for ACTOS."

"[T]he office is no longer using Actos due to concerns of bladder cancer"

2-SER-36–50.

### D. Econometric Modelling Establishes that, Had a Bladder Cancer Warning Been Issued from the Outset, the Class Would Have, on Average, Paid for 56% Fewer Actos Prescriptions

Dr. Comanor is a Distinguished Professor at the Fielding School of Public Health and Director of the Research Program in Pharmaceutical Economics and Policy at the University of California, Los Angeles. 4-ER-491. He is a pharmaceutical economist, having published over 120 journal articles and chapters on the subject. 4-ER-562–577. Indeed, Dr. Comanor's doctoral work is considered the genesis of the entire field.[3]

---

[3] In 2015, a prestigious economics journal published a series of articles "Honoring Williams S. Comanor and 50 Years of Pharmaceutical Economics." 2-SER-16. The journal "commemorates a half-century

Here, Dr. Comanor, along with his colleague Dr. Jon Riddle, prepared econometric regression models to estimate what effect, if any, the concealment of the bladder cancer risk had on Actos utilization. *See* 3-ER-198–261; 4-ER-490–559. After reviewing the literature on TZD utilization and Takeda's and Lilly's internal studies, Dr. Comanor obtained national prescription data and constructed "time series regression models designed to explain the quantities of Actos prescriptions dispensed during the damage periods." 4-ER-520–533. The dependent variable was total Actos prescriptions ("TRx"). *See* 4-ER-593. The explanatory variables were the existence of a bladder cancer warning, the existence of a heart failure warning (added to the Actos label in 2007), generic entry of pioglitazone, the total size of the oral anti diabetes drug market each month, the monthly price of Metformin, and the number of competitive drugs in the marketplace in each month. 4-ER-524–525, 4-ER-593–596.

Dr. Comanor's third model, which focuses on the period after the

since the opening of the field of pharmaceutical economics with Bill's foundational 1964-1966 publications adapted from his Harvard 1963 doctoral thesis." 2-SER-16.

September 2010 bladder cancer alert, yields robust results, with an $R^2$ value of 99%, i.e., less than 1% of variation is unaccounted for.  4-SER-530–531.  Indeed, as shown in Fig. 7 in Dr. Comanor's report, Model III's predicted Actos volume, while controlling for numerous market variables, closely tracks actual volume during that same period—further indicating its predicative power.  4-SER-551.

Using this regression model, Dr. Comanor estimated the relative market share of Actos at the end of 2013—a point where the market was fully informed about the bladder cancer risk—and created a benchmark.[4]  4-ER-532–533, 553, 599.  Using this benchmark, Dr. Comanor estimates "the 'but-for' volumes of Actos prescriptions had the bladder cancer risk been widely known" starting in July 1999 (when Actos first entered the market).  4-ER-533.  Overall, Dr. Comanor estimates that, between 1999, i.e., the entry of Actos into the market, and September 2010, i.e., the first bladder cancer alert, on average, 44%

---

[4] Dr. Comanor also prepared Model IV, which performed a regression on the entire dataset, and included a variable for pre- and post-bladder cancer alert.  3-ER-210–213.  The bladder cancer alert demonstrated a statistically significant negative effect on Actos utilization, "indicating there is a direct association between the bladder cancer risk announcements and Actos utilization."  3-ER-211.

of the Actos prescriptions would have still been purchased had the bladder cancer risk been public. 3-ER-256. This estimate is based on a regression of Actos sales following the bladder cancer disclosure. In other words, there would have been, on average, 56% fewer Actos prescriptions had Takeda and Lilly not committed fraud.

Using this model, Dr. Comanor and his team calculated three damage estimates—excluding claims of those TPPs that had previously settled, *see* 4-SER-515, and government payers. 3-ER-231–232. The first estimate ($2,541,722,243) is the total amount spent by the RICO Class on Actos prescriptions caused by concealment of bladder cancer, i.e., the money that would not have been spent on Actos but-for the RICO violations. 3-ER-258. The second estimate ($2,343,748,287) makes the same calculation but reduces the estimate by the cost (at each time period) of the most common therapeutically equivalent medication, metformin. 3-ER-259. The third estimate ($2,023,405,831) reduces the damage estimate by the average cost at each time point of all other oral antidiabetic drugs ("OADs") on the market. 3-ER-260. Dr. Comanor also applied his damages model to Painters directly, estimating individual damages of $62,159 (non-offset), $57,793

(metformin offset), and $50,241 (all other OAD offset). 3-ER-261; 4-ER-559.

## III. The Lawsuit:  Because of Takeda and Lilly's Civil RICO Violations, the Class of TPPs Paid for Excess Prescriptions of Actos

Plaintiffs assert a quantity-effect theory of liability, i.e., that because of the Defendants' RICO violations, Takeda and Lilly were able to sell greater quantities of Actos.  This lawsuit was initially filed in the MDL in 2014 and, in 2017, was transferred, by agreement, to the Central District of California.  The RICO claims were dismissed with prejudice, but this Court reversed that decision.  *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd. ("Painters I")*, 943 F.3d 1243 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 86 (2020); *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd. ("Painters II")*, 796 F. App'x 919 (9th Cir. 2019).  After remand, the case was transferred to the Hon. John W. Holcomb.  Defendants' second motion to dismiss was denied.  *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 520 F. Supp. 3d 1258, 1263 (C.D. Cal. 2021).

Following a year of discovery, Plaintiffs moved to certify a RICO

27

class of TPPs and a class of California consumers. At the same time, Takeda and Lilly filed motions to exclude the expert opinions of Plaintiffs' econometric experts under *Daubert*. In March 2022, the DC held a day-long hearing on the motions. 1-ER-6. Shortly after the argument, this Court decided *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc), *cert. denied sub nom.,* 143 S. Ct. 424 (2022), and the parties submitted supplemental briefing. 1-ER-6. On May 22, 2023, the DC denied the Defendants' motion to exclude Dr. Comanor's expert opinion. 1-SER-2–12. A few days later, on May 24, 2023, the DC issued its order, certifying the TPP RICO Class and denying certification of the consumer California class. 1-ER-45. Defendants filed a Rule 23(f) petition to appeal, which this Court granted. This appeal followed.

## SUMMARY OF ARGUMENT

Appellants focus on the DC's predominance and superiority analysis under Rule 23(b)(3) – they do not challenge the other elements.

As an initial matter, the DC applied the correct legal standard and engaged in a rigorous analysis of the evidence. This analysis was spelled out in the DC's class certification order *and* in its *Daubert*

ruling.  Importantly, the DC considered the Appellants' specific challenges and rejected them as unpersuasive under a preponderance of the evidence standard—the precise scrutiny required of a DC in assessing class certification.

The remaining arguments center on whether the DC abused its discretion, i.e., reached illogical, implausible, or factually unsupported conclusions, in finding, by a preponderance of the evidence, that common issues predominated and that the class modality was superior. And, on this, the record is clear—there was no abuse of discretion.

First, Appellants claim the DC abused its discretion in finding that common issues predominate on the RICO element of but-for causation. Not true.  The DC rigorously considered a "mountain" of common evidence presented by Plaintiffs—internal marketing studies, peer-reviewed literature, company emails and admissions, and various econometric models—which, collectively, could establish but-for causation for the class or any individual TPP.  Under *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) and *Olean*, when a DC concludes that an element can be established, individually, using only common proof, it does not abuse its discretion in finding predominance.

Appellants also claim that the DC did not consider various criticisms of Dr. Comanor's econometric analyses. But, again, that is not true. Far from ignoring them, the DC carefully considered and weighed the challenges raised to Dr. Comanor's regression modeling in ruling that the opinions were admissible under *Daubert*—an order Appellants almost entirely ignore in their opening brief.

The DC also considered a potential affirmative defense, i.e., that some prescribers would have prescribed Actos regardless of the concealed bladder cancer risk, and whether that defense would involve overwhelming individual inquiries. However, Appellants submitted no evidence in support of this defense, and the little evidence that was in the record *contradicted* it. Absent some record to weigh and assess, the DC concluded that the theoretical possibility of an individual affirmative defense did not overwhelm the common issues. This approach is consistent with the law, delineated in *Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023) and *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018)—the burden rests with defendants to raise the "spectre" of individualized defenses. They did not. Thus, there was no abuse of discretion.

Second, Appellants take issue with limiting the class to those TPPs with five independent Actos prescriptions. Plaintiffs estimate that if a TPP made five independent purchases of Actos, then there is 98.5% chance that it paid for at least one fraudulently induced prescription, i.e., was injured. Appellants do not dispute whether the use of probability is appropriate; instead, they claim that determining whether a prescription is "independent" requires complicated adjudication of individual issues. But this is a misapprehension of what constitutes an "independent" prescription. An independent prescription is merely a *new* prescription, i.e., not a refill. And, as demonstrated by experts on both sides, filtering prescription data based on new prescriptions is easily done. The "individual" nature of an "independent" prescription does not overwhelm the common issues. There was no abuse of discretion.

Third, Appellants take issue with Plaintiffs' proposed damage estimates. Plaintiffs proposed three models. The first model estimates how much money was spent on RICO-induced Actos prescriptions and can be applied across the entire class or, individually, with any TPP. Appellees maintain that this model is the proper way to calculate

31

damages. Appellants, however, maintain that RICO injury and/or damages must be reduced or "offset" by any money that, had no fraud occurred, would have been spent on an alternative treatment to Actos. This, however, is an incoherent interpretation of the law. Fraud damages should not be offset by what would have happened to that money absent the fraud. If a diabetic is defrauded into purchasing a "sugar free" snack that, in truth, contains sugar, there is still an injury and there are economic damages even though, absent the fraud, the diabetic would have paid the same money for *actual* sugar free food. To hold otherwise would effectively immunize fraudsters from damages and, if an offset is applied, allow the fraudster to keep money they fraudulently obtained (i.e., the amount of the offset).

Notwithstanding this disagreement on the law, Plaintiffs proposed two additional damages models that included offsets. The second model offset damages by the time-specific costs of a therapeutically equivalent OAD, metformin. The third model offset damages by the time-specific costs of the average of all other OADs on the market. These approaches, assuming an offset is legally required, provide reasonable estimates of damages that are consistent with the theory of liability.

Appellants only challenge the metformin offset by claiming that it assumes all people who did not take Actos would have, instead, used metformin. This, according to them, "blinks" reality. But, this argument just misconstrues the record. The metformin offset (or the "all other OADs" offset) does not presume that every patient would have used metformin (or another OAD) in the absence of Actos. Rather, it merely reflects a comparable "value" of a therapeutically equivalent drug. In the context of damages, the law does not require absolute precision—reasonable estimates are fine. Any other rule would entice tortfeasors to make fraud so devious and so complicated that damage estimates would be impossible. And here, in the context of class certification, provided the damage model is reasonable and consistent with Plaintiffs' theory of liability, the fact that individual inquiry might be needed to determine damages cannot defeat class certification. The DC held as much. There was no abuse of discretion.

Finally, Appellants attack the DC's consideration of superiority because, in large part, he did not detail how a trial would work. However, the DC specifically addressed the manageability of trial and concluded that, although a single RICO Class trial may be a

33

"nightmare," it was still preferable to thousands of trials that would cover much of the same material.  Such a finding is clearly within the DC's broad discretion.

The class certification order should be affirmed.

## STANDARD OF REVIEW

The Court reviews "the decision to certify a class and 'any particular underlying Rule 23 determination involving a discretionary determination' for an abuse of discretion."  *Olean*, 31 F.4th at 667 (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010)). "[U]nderlying legal questions" are reviewed "de novo" and "determination of underlying factual questions" are reviewed "for clear error[.]"  *Id.*  The Court reviews "the DC's determination that a statistical regression model, along with other expert evidence, is capable of showing class-wide impact, thus satisfying one of the prerequisites of Rule 23(b)(3) … for an abuse of discretion." *Id.*

In assessing abuse of discretion, the Court first looks at "whether the trial court identified and applied the correct legal rule" and then looks at "whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in

inferences that may be drawn from the facts in the record." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009)).

## ARGUMENT

Although the DC rigorously analyzed and ruled on all elements of Rule 23(a) and (b)(3) in certifying the RICO Class, Takeda and Lilly limit their appeal to the DC's consideration of the predominance and superiority elements. As shown below, there was no abuse of discretion.

## I. The District Court Correctly Held that Questions of Law and Fact Common to the Class Predominate Over Questions Affecting Only Individual Members

"Rule 23(b)(3) predominance inquiry" is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453–54. The question turns on "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting 2 Newberg on Class Actions § 4:49 (5th ed. 2012)).

"Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013). Even if "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately[.]" *Tyson Foods*, 577 U.S. at 454 (quotation omitted).

The DC conducted its predominance inquiry according to "the elements" of a RICO claim. 1-ER-16 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). "Broadly speaking, there are two parts to a civil RICO claim." *Painters I*, 943 F.3d at 1248. The first is the "RICO violation," defined by 18 U.S.C. 1962(c) & (d), and second is "RICO standing" as defined by 18 U.S.C. 1964(c). Although the DC analyzed predominance for each RICO element, Appellants only appeal the DC's predominance analysis regarding the second part, RICO standing.

RICO standing specifies who may bring a civil claim. It is defined as "[a]ny person injured in his business or property by reason of a

violation of section 1962 of this chapter[.]" 18 U.S.C. § 1964(c). This language requires proof that the RICO violations were a (1) but-for and (2) proximate cause of the (3) plaintiff's economic injury. *Painters I*, 943 F.3d at 1248 (quoting *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008)). Appellants do not appeal the DC's analysis of proximate causation, nor did they challenge it at class certification. 1-ER-26. Instead, the issue on appeal is whether the DC's predominance analysis of the elements of but-for causation, injury, and damages constituted an abuse of discretion. The record is clear—there was none.

### A. The District Court Correctly Determined that But-For Causation Could be Established for an Individual Class Member Using Common Evidence

A class representative can demonstrate predominance under Rule 23(b)(3) for an element if, using only common evidence, there exists a triable issue of fact regarding that element. This is one of the core holdings in *Tyson Foods*: one "permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action." 577 U.S. at 455. Indeed, this Court, *en banc*, recently reiterated the *Tyson Food* rule:

37

> [I]f 'each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action,' and the evidence 'could have sustained a reasonable jury finding' on the merits of a common question … then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements[.]'"

*Olean*, 31 F.4th at 667 (quoting *Tyson Foods*, 577 U.S. at 455).

In the context of but-for causation, a TPP must prove that Takeda and Lilly's fraudulent concealment of the bladder cancer risk caused it to pay for an additional quantity of Actos than it otherwise would have. *See Painters I*, 943 F.3d at 1247. The Ninth Circuit has not directly addressed what evidence creates a triable issue of fact on but-for causation under this theory, although when this case was last on appeal, the Court endorsed the First Circuit's *Neurontin* cases as persuasive. *See Painters I*, 943 F.3d at 1257.

In the trio of *Neurontin* cases—*In re Neurontin Mktg. & Sales Pracs. Litig. ("Kaiser")*, 712 F.3d 21 (1st Cir. 2013); *In re Neurontin Mktg. & Sales Pracs. Litig. ("Aetna")*, 712 F.3d 51 (1st Cir. 2013); *In re Neurontin Mktg. & Sales Pracs. Litig. ("Harden")*, 712 F.3d 60 (1st Cir. 2013)—the First Circuit addressed what evidence is required to create a triable issue of fact regarding but-for causation in a quantity-effect

RICO case.

In *Kaiser*, to prove but-for causation, Kaiser presented direct evidence of Pfizer's fraudulent conduct and a regression analysis by Dr. Meredith Rosenthal. 712 F.3d at 45-48. Using prescription data, Rosenthal estimated the percentage of off-label prescriptions caused by Pfizer's fraudulent conduct. *Id.* at 30. "These calculations applied to Kaiser as well as to other payors across the country." *Id.* at 30 n.5. After concluding Rosenthal's regression was admissible under *Daubert*, *id.* at 42-45, the First Circuit focused on whether the regression could prove but-for causation. *Id.* at 45. Pfizer argued that the model was insufficient because "it does not take into account the patient-specific, idiosyncratic decisions of individual prescribing physicians." *Id.* The First Circuit rejected this argument, explaining that "[t]he existence of some doctors who purportedly were not influenced by Pfizer's misinformation would not defeat the inference that this misinformation had a significant influence on prescribing decisions which injured Kaiser." *Id.* The aggregate evidence was, itself, sufficient to create a triable issue on but-for causation.

In *Aetna*, the First Circuit clarified this holding. 712 F.3d at 55-56.

Aetna, unlike Kaiser, was unable to present evidence of "any direct misrepresentations to it[.]" *Id.* at 55. Instead, Aetna presented Rosenthal's regression model and circumstantial evidence that there was an increase of "prescriptions of Neurontin following the initiation of Pfizer's alleged fraudulent marketing efforts, and the fact that Pfizer embarked on these efforts in order to increase sales of Neurontin[.]" *Id.* at 57. The First Circuit held that "the evidence Aetna presented . . . survive[d] summary judgment." *Id.* The statistical model, in combination with persuasive circumstantial evidence, created a triable issue of fact on but-for causation. *Id.* at 58 n.3. The First Circuit also rejected the argument that Aetna needed to individually "prove which doctor's prescriptions were caused by Defendants' alleged fraudulent misrepresentations[.]" *Id.* at 58. The First Circuit explained that quantifying the number of prescriptions caused by the fraud "belongs to the damages phase of Aetna's RICO case," not in determining but-for causation, and that different standards governed damages. *Id.*

In *Harden*, the trial court denied class certification, reasoning "the plaintiffs could not use statistical evidence to establish class-wide causation in a consumer fraud claim under . . . RICO" because "it did

40

not take account of doctors' individual prescribing decisions[.]"  *Id.* at 63.  The trial court also granted summary judgment.  *Id.*  On appeal, the First Circuit reversed summary judgment and vacated the denial of class certification.  It held that "[t]he Harden plaintiffs need not prove causation through the testimony of individual doctors.  The combination of the aggregate evidence and the circumstantial evidence was enough" to overcome summary judgment, and vacated the denial of class certification "[i]n light of our holdings … regarding RICO causation principles[.]"  *Id.* at 70.[5]

Together, the *Neurontin* cases hold that a TPP can establish but-for causation in a quantity effect pharmaceutical RICO case using a combination of statistical and persuasive common evidence.  The First Circuit reaffirmed this analysis in *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 12-13 (1st Cir. 2019) ("All together, this is surely enough to raise a triable issue of fact as to whether Forest's

---

[5] On remand, Harden moved, again, for class certification.  During oral argument, the district court told the parties, "I am, let me just say this, likely to certify a class because essentially the point of view that you're espousing, that I shared, was reversed. . . . I am going to write it up, so it will not happen immediately."  3-SER-349.  Shortly after, the parties reached a $325 million class settlement.  3-SER-390, 394.

off-label marketing caused Painters to pay for a prescription for which it would not have otherwise paid."); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 94-95 (2d Cir. 2015) (noting that "it may be possible to demonstrate class-wide RICO causation … by adducing generalized proof from which a reasonable jury could conclude that only some prescriptions paid for by each class member were written based on the defendant's alleged misrepresentations[.]").

This persuasive out-of-circuit law gave the DC "confidence" that common evidence could be used to establish but-for causation for an individual TPP. 1-ER-28. And, in reviewing the record, the DC held that "Plaintiffs supply a mountain of evidence regarding but-for causation that is common to the class, *e.g.*, Comanor's regression model, internal email conversations, academic studies, data regarding physician information requests, and the results of Takeda's internal investigations[.]" 1-ER-31. That evidence, collectively, can establish "but-for causation under a quantity-effect theory for a single TTP or even a class of them." 1-ER-28. The DC concluded that "Plaintiffs have shown, by the preponderance of the evidence, that common questions of

42

fact predominate over the element of but-for causation." 1-ER-31. The DC "is in the best position to determine whether individualized questions … 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Olean*, 31 F.4th at 669 (quoting *Halliburton*, 573 U.S. at 276). The DC's consideration of predominance is well "within a broad range of permissible conclusions" a district court is permitted to make. *Id.*

Appellants make three challenges. None are availing. First, Appellants argue that the DC failed to conduct a rigorous analysis of Dr. Comanor's econometric modeling. Second, Appellants launch a series of attacks on Dr. Comanor's econometrics, restating arguments the DC considered and rejected under a *Daubert* analysis that Appellants do not cite. Finally, Appellants claim that the DC failed to consider how a potential affirmative defense could overwhelm common evidence of causation, but cite little more than speculation and conjecture.

### 1. The District Court Rigorously Considered Dr. Comanor's Econometric Modeling in Assessing Predominance

Appellants ignore the "mountain" of evidence that the Court

considered in assessing but-for causation and, instead, focus on the DC's consideration of one aspect of that analysis, i.e., Dr. Comanor's regression analysis. They take a comment from a footnote and use it to claim that the DC did not engage in a rigorous analysis of Dr. Comanor's regression model. Opening.Br.23–27. This is simply untrue.

In assessing predominance, "a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67. And, while that *may* "'entail some overlap with the merits[,]' … 'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) and *Amgen*, 568 U.S. at 466).

The DC should engage in a *Daubert* analysis of an expert opinion and consider that analysis in weighing whether the elements of class certification are met. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). However, admissibility, whether admitted or excluded, is not the determinant under Rule 23. *Id.* (inadmissible testimony must be weighed); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.

2011) (admissible testimony must be weighed). In assessing predominance, the DC must be persuaded that the common issues of law and fact predominate over the individual ones, admissibility factors into that consideration. *See Olean*, 31 F.4th at 667 (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008), as amended (Jan. 16, 2009)). However, in considering *persuasiveness* at class certification, the district court is not examining whether the expert's testimony persuades the district court that the expert is, in fact, right, but whether the testimony persuades the district court that *predominance* is satisfied. *Id.* at 667 ("[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue[.]"). The Supreme Court in *Tyson Food* was clear on this point:

> Once a district court finds evidence to be admissible, its *persuasiveness is, in general, a matter for the jury*. … The district court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing.

577 U.S. at 459.

Here, the DC conducted a *Daubert* analysis of Dr. Comanor's regression analysis. 1-SER-2–12. The DC specifically noted that other courts use "*Daubert* as a guide to determine the weight that evidence receives at the class certification stage" and that, here, it "follows their lead." 1-SER-5. The DC held that "on balance, the Comanor Report is reliable" and that it "pass[es] muster under *Daubert* … even though that hurdle is higher than the one that Plaintiffs must meet here." 1-SER-5. Indeed, after considering *each* criticism levied by Takeda and Lilly and their expert, the DC concluded "that none is so *persuasive* as to limit the Court's consideration of Comanor's testimony[.]" 1-SER-6 (emphasis added). The DC did exactly what was required of it and was not persuaded by Takeda and Lilly's methodological challenges.

Appellants cite a footnote in the DC's certification order, where the court stated that it "takes Comanor's report at face value and does not prejudge its accuracy." 1-ER-22. This, according to Appellants, constitutes reversable error. Nonsense. The DC merely refused to weigh-in on the merits of an otherwise admissible opinion, consistent with the law. *See Tyson Foods*, 577 U.S. at 459. Indeed, the DC explained in the *next sentence*: "While the Court found his testimony to

46

be admissible for purposes of class certification, it is up to the finder of fact to weight Comanor's testimony in view of any cross-examination or contracting evidence or testimony from Takeda's experts." 1-ER-22. The DC also noted that Takeda and Lilly did not present a competing regression analysis; they focused exclusively on attacking Dr. Comanor's methodology. 1-ER-22. So, once the DC rejected those methodological attacks under the heightened *Daubert* standard, the court was not left with "competing experts"—rather, he was left with a "mountain" of evidence, of which, Dr. Comanor's regression was but one boulder. 1-ER-31.

The DC engaged in a rigorous analysis of the evidence Painters presented, even going so far as to complete a *Daubert* analysis of Dr. Comanor's report. The DC discussed how that admissible and reliable evidence, in conjunction with other evidence, could be used to establish but-for causation and injury for the Class. He engaged in the precise analysis required.

## 2. Appellants' Criticisms of Dr. Comanor's Econometric Model Were Considered and Rejected by the District Court Pursuant to Its Broad Discretion

Appellants argue that Dr. Comanor "did not, in fact, use an

'econometric regression model'" to estimate how many prescriptions were fraudulently induced. Opening.Br.28. And, they claim that because the DC did not rigorously consider Dr. Comanor's report, the DC was unaware of how Dr. Comanor's model worked. Opening.Br.28–29. Both of these arguments are false.

*First*, Dr. Comanor *did* use regression (Models I, II) to analyze the market, *see* 4-ER-520–529, and to estimate the effect of the bladder cancer disclosure on Actos utilization and establish a benchmark (Model III). 4-ER-532–534; 4-ER-597–599; 4-ER-610–611. These models specifically accounted for numerous market factors that could have influenced Actos utilization. *Id.*; *see* 3-ER-235–237; 4-ER-593–600 (describing explanatory variables used in regression models). Then, using the predicted values from those regression models, which controlled for numerous explanatory variables (Model III), Dr. Comanor predicted Actos market share at the end of December 2013—a period when, according to Dr. Comanor, the class was likely fully-informed. 4-ER-532–534 ("[W]e calculate the predicted number of prescriptions using Model III in the final month of the sample, December 2013[.]"). Then, he used that benchmark to estimate how many prescriptions,

each year, would have occurred regardless of the fraud. 4-ER-532–534; 3-ER-236–237.

Appellants misstate the record—Dr. Comanor did not simply take the December 2013 Actos market share and extrapolate. *See* Opening.Br.30. The December 2013 market share estimate was generated using multiple-regression, accounting for numerous other market factors, from the post-bladder disclosure period. 3-ER-235–237; 4-ER-593–600.

*Second*, Appellants claim that the DC was not aware of this December 2013 benchmark. *See* Opening.Br.28, 34. Again, not true. The DC specifically considered and rejected Takeda and Lilly's challenges to using the post-bladder cancer disclosure regression in its *Daubert* ruling (which Appellants fail to mention): "the Court finds it reasonable for Comanor to have used post-damages-period data because it helped Comanor estimate the dispensation of Actos prescriptions 'before and after.'" 1-SER-7; *see* 3-ER-524–529. Dr. Comanor explained why his benchmark, "before and after" approach is more reliable than using a regression of the entire period:

I considered [a single regression model] at the start of our

> research but rejected it because of the clearly evident
> indications of structural change would lead to widely
> different coefficients in the two periods. With major shifts in
> demand that followed the FDA announcements, a combined
> model would not fit the underlying data[.]

3-ER-209; *see* 3-ER-206–213, 3-ER-217–219; *see also* 4-ER-532–534.

Indeed, a regression using data from the entire class period confirmed

the statistically significant effect of the bladder cancer disclosure on

Actos use although it did not fit the data well due to structural

differences. 3-ER-210–213.

Further, the DC noted that using the December 2013 benchmark "is

a reasonable estimate, in view of the empirical evidence showing the

numbers of Actos prescriptions reaching a new stable state

equilibrium—i.e., flatlining." 1-SER-7. This reflects the fact that at the

point of the benchmark, 96% of TPPs had decreased Actos utilization,

and Actos utilization had "flatlined." 1-SER-7; 3-ER-228–230, 3-ER-

235–236, 4-ER-531–534.

Taking a benchmark, i.e., a regressed estimate of Actos market

share from a period where there was no fraud and comparing it to the

sales during the period of the fraud, is an accepted method of

estimating the effect of that fraud. *See Olean*, 31 F.4th at 671 (using

regression to establish benchmark and then comparing that benchmark to prior sales); *accord In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002) (expert used "as a potential benchmark, the potential prices charged for linerboard during a competitive period when there would be no effects of the conspiracy."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014) ("Dr. McClave used a multiple-regression analysis to develop models predicting prices that would have existed in a competitive market. He then compared these prices to the actual prices during the conspiracy period."); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 389 (D.R.I. 2019) ("Using the before-during-after method, Dr. French establishes a suitable benchmark by identifying a period of time during which Defendants' alleged anticompetitive conduct was absent from the market."). The DC clearly considered this issue but simply did not find Takeda and Lilly's arguments, or their expert, persuasive.

Additionally, Appellants cite various "market factors" such as "introduction of new type-2 diabetes treatment options," "the launch of generic drugs," and a 2007 cardiovascular warning as things Dr. Comanor and the DC failed to consider. *See* Opening.Br.31–32. But,

Dr. Comanor *did* account for these factors and the DC *did* consider them.

Dr. Comanor, in response to Appellants' criticisms, specifically re-ran the three regressions using "the number of new oral anti-diabetes medications approved by the FDA between 1999 and 2013," which included generic entry, and it had no effect on the results. 3-ER-216. The DC considered this issue and held that Dr. Comanor's approach was "reasonable" because "[c]ommon sense suggests that generic drugs compete with existing drugs" and "[a]pparently, statistical evidence does too[.]" 1-SER-9 (citing Dr. Comanor's analysis).

Regarding the cardiovascular warning added in 2007, the DC considered that issue as well, but ultimately concluded that "[t]he data contradict Takeda's assertion … because it shows pioglitazone use remained flat, if not marginally increasing, in the months after the cardiovascular risk became publicly known." 1-SER-8. The DC did not find Takeda and Lilly's arguments persuasive enough to discount Dr. Comanor's analysis.

Appellants attempt to transform Dr. Comanor's regression modeling into a "simplistic extrapolation" because Appellants want it to

fit it into the reasoning of *UFCW Loc. 1776 v. Eli Lilly & Co.* (*"Zyprexa"*), 620 F.3d 121 (2d Cir. 2010), where Appellant Lilly was successful in defeating class certification. But, *Zyprexa* is inapposite.

This Court, *in this case*, already disagreed with *Zyprexa*. *See Painters I*, 943 F.3d at 1256-57 ("[I]t seems the central dispute between the Second and Seventh Circuits and the First and Third Circuits is whether the decisions of prescribing physicians and pharmacy benefit managers constitute intervening causes that sever the chain of proximate cause between the drug manufacturer and TPP. We think the First and Third Circuits have it right[.]"). To be fair, that disagreement focused on proximate causation, but the underlying *Zyprexa* decision based its but-for causation analysis on the very reasoning this Court rejected. *See Zyprexa*, 620 F.3d 134-136.

In *Zyprexa*, the court held in *dicta*[6] that "general proof of but-for causation" was "impossible" because prescribing doctors may have reacted differently to the same fraudulent conduct. *Id*. at 135-36.

---

[6] Plaintiffs had abandoned the quantity effect theory, but the Second Circuit chose to explain why it was doomed for failure anyway. *See Zyprexa*, 620 F.3d at 135.

However, requiring individual prescriber proof, as a matter of law, was rejected in the first appeal, *see Painters I*, 943 F.3d at 1258, and has been rejected by First Circuit, *see Harden*, 712 F.3d at 68 ("[P]laintiffs need not prove causation through the testimony of individual doctors. The combination of the aggregate evidence and the circumstantial evidence was enough[.]").  Indeed, even the Second Circuit backtracked.

In *Sergeants*, again in *dicta*, the Second Circuit specifically explained how it might be possible to prove but-for causation using common evidence because "each [TPP] would have been injured by Aventis's misrepresentations so long as at least some of the prescriptions for which [the TPP] paid were written in reliance on those misrepresentations."  806 F.3d at 94.  The court, citing *Neurontin*, noted that "reliance can be proved to a jury with sufficiently powerful aggregate evidence, as opposed to individualized inquiries as to each prescribing physician's actual decisionmaking."  *Id.* at 97.  The Second Circuit, however, did not fully reach the issue, because in the case before it, the plaintiffs pursued an "all or nothing" theory that was too simplistic.  *Id.* ("Plaintiffs' causation evidence—apparently by their own choice—is akin to the simplistic proof introduced by the *Zyprexa*

plaintiffs, and not to the far more sophisticated proof offered in *Neurontin*.").  That approach in no way resembles Dr. Comanor's numerous regression analyses to estimate a benchmark—which were expressly reviewed and deemed reliable by the DC.

### 3. The District Court Carefully Considered the Evidence Relating to Appellants' Affirmative Defense and Held That the Common Issues Still Predominated

After finding that common evidence could establish but-for causation, the DC explained that "[a]ffirmative defenses, too, must be considered."  1-ER-30.  Specifically, the DC considered whether Takeda and Lilly could present testimony of "individual prescribing physicians to contest Plaintiffs' theory of but-for causation" by showing "that they would have continued to prescribe Actos, notwithstanding the bladder cancer risk."  1-ER-29.  A jury could, conceivably, consider such testimony and reject the "common evidence of but-for causation[.]"  1-ER-29.  The DC, however, held that this theoretical defense did not defeat predominance because "[a]s the tally stands, individual issues would not predominate over but-for causation if the trial was held today."  1-ER-30–31.  Takeda and Lilly did not depose any individual

prescriber related to the RICO Class, and only presented two depositions of prescribers related to the California class. 1-ER-31. The DC, refused "to make decisions on conjecture" and found, by a preponderance of the evidence "that common questions of fact predominate over the element of but-for causation." 1-ER-31.

Appellants raise two challenges. The first is a legal one— Appellants claim that DC improperly shifted the burden to Takeda and Lilly to disprove predominance by insisting that they present evidence. Opening.Br.45–46. But that is not correct. "[A] plaintiff need not rebut every individualized issue that could possibly be raised. … Instead, a plaintiff must merely demonstrate by a preponderance of the evidence that a common question of law or fact exists." *Van*, 61 F.4th at 1066– 67. "If the plaintiff demonstrates that class issues exist, the defendant must invoke individualized issues and provide sufficient evidence that the individualized issues bar recovery on at least some claims, thus raising the spectre of class-member-by-class-member adjudication of the issue." *Id.* In *True Health Chiropractic*, this Court was clear that in the context of an affirmative defense, because "[the defendant] bears the burden, we assess predominance by analyzing the [affirmative] defenses

[the defendant] has actually advanced and for which it has presented evidence. … we do not consider the [affirmative] defenses that [the Defendant] might advance or for which it has presented no evidence." 896 F. 3d at 931–32.

Here, the DC limited its predominance analysis of but-for causation to the actual evidence in the record, and refused to engage in speculation about what Takeda and Lilly's non-extant evidence might or might not show.  *See id.* at 932 ("We are unwilling to allow such 'speculation and surmise to tip the decisional scales in a class certification ruling[.]'" (quoting *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) and *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)); *see Tyson Foods*, 577 U.S. at 453 ("[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as … some affirmative defenses peculiar to some individual class members.").  For the limited evidence that Takeda and Lilly did present, i.e., two depositions of prescribers that were not even part of the RICO class, the DC expressly considered it and found it lacking in the face of Plaintiffs' "mountain" of evidence.  1-ER-31.  The

DC applied the correct legal standard and abused no discretion.

Second, Appellants argue that this testimony from two prescribers was sufficient to "summon the spectre" of individualized defenses. Opening.Br.47–48. But, again, Appellants misapprehend the law. To establish but-for causation, an individual TPP need only prove that it paid for at least *one* fraudulently induced prescription. *See Painters I*, 943 F.3d at 1251; *Painters II*, 796 F. App'x at 921; *In re Celexa*, 915 F.3d at 13 (same); *Sergeants*, 806 F.3d at 94 (one excess purchase constitutes injury under RICO). And, under *Van*, the "spectre" of individual issues only emerges when defendants "provide sufficient evidence that the individualized issues *bar recovery on at least some claims*." 61 F.4th at 1067 (emphasis added). Thus, Takeda and Lilly needed to provide evidence that at least *some* TPPs did not pay for a single excess Actos prescription despite their fraud using this individual defense.

And yet, Takeda and Lilly not only failed to present *sufficient* evidence to undermine causation, they presented *no* evidence *supporting* their affirmative defense. The first prescriber testified that she prescribes less Actos because of the bladder cancer risk and that she has observed "similar decreases in use" among her colleges "at Kaiser

following the bladder cancer risk disclosure." 2-SER-26. The second prescriber testified that, once she learned of the bladder cancer risk, she stopped using it with *some* patients (men over 60 who smoke). 2-ER-63. Both depositions *confirm* that Actos utilization *decreased* because of the bladder cancer risk—the exact *opposite* of what Takeda and Lilly must prove. And this makes sense. The "mountain" of evidence presented by Plaintiffs indicates that prescribers—like the two presented to the DC—*reduced* Actos use *because* of the bladder cancer risk.

That said, if one construed this evidence as evincing some type of affirmative defense to but-for causation, even still, "the district court must determine, based on the particular facts of the case," whether predominance is nonetheless met. *Van*, 61 F.4th at 1067; *see Halliburton*, 573 U.S. at 276 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."). And, that weighing was done by the DC, consistent with the law. 1-ER-26–31; *see, e.g.*, *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 737 (9th Cir. 2007) ("The district court gave full consideration to AWS's argument and did not abuse its discretion in

determining that individual circumstances would not defeat the predominance of common issues.").

## B. The District Court Correctly Determined that Uninjured Class Members Can be Identified and Excluded in a Way that Does Not Implicate Overwhelming Individual Issues

Before a TPP can recover under RICO, it must be injured, i.e., it paid for at least one fraudulently induced Actos prescription. Thus, by definition, some individual inquiry is necessary to determine whether a TPP was injured. However, "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 669. The class, as defined, can potentially include uninjured class members, but before certification, the district court "must determine whether common questions 'predominate[] over any .. individualized questions about injury[.]" 1-ER-21 (quoting *Olean*, 31 F.4th at 669).

A certain number of Actos prescriptions would have been purchased by TPPs even if Takeda and Lilly had not concealed the bladder cancer risk. *See* 4-ER-539–540. It is conceivable that some very small TPP, due to its limited Actos purchases, was simply not injured by Takeda

and Lilly's RICO violations. Thus, to be part of the RICO Class, each TPP is required to have purchased at least five independent prescriptions of Actos. Assuming 56% of Actos prescriptions were fraudulently induced, the likelihood of a class member being uninjured is miniscule, i.e., 1.5%. The DC agreed.

After determining that Dr. Comanor's analysis, *see* 3-ER-221–222; 4-ER-539–540, was a reliable method to winnow uninjured class members, 1-SER-9–10, the DC reasoned that if a TPP paid for at least five independent prescriptions of Actos, there is a 98.5% chance that the TPP was, in fact, injured. 1-ER-21–23. Put another way, "if Painters paid for as few as five independent prescriptions, there would be a 98% chance that at least one was the result of" the RICO violation "[s]o the odds that Painters was not harmed … was likely *infinitesimal*." *In re Celexa*, 915 F.3d at 13 (emphasis added); *accord In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550, at *33 (D. Kan. Mar. 10, 2020) ("[P]robability analysis provides a plausible method for determining—across the classes—the number of class members who may not have sustained injury from defendants' purported conduct.");

*In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 717 (E.D. Pa. 2020) ("the likelihood that a payor with only 10 independent claims for Niaspan had no generic claims is approximately 1 in 1 billion."). The DC held that the risk of the class including uninjured class members was *de minimis*, "and it is more likely than not that common questions of fact would predominate over individualized ones when it comes to injury." 1-ER-23.

Appellants do not dispute the use of probability to winnow uninjured class members—instead, they argue that determining whether a prescription is "independent" entails "thousands of fact-intensive inquiries into the prescribing practices of individual doctors." Opening.Br.37. Not true.

An "independent" prescription is simply a new Actos prescription paid for by a TPP, i.e., a non-refill. 3-ER-221 ("The probability analysis thereby applies to the number of new Actos and Actos Combination prescriptions processed by a particular third party payer."); *see* 3-ER-318; 4-ER-539–540. And determining whether a prescription is "new" is easily done using claims data; the DC noted that the experts for both sides were able to easily filter and sort data based on new prescriptions

"to screen out TPPs that did not fall within the class definition[.]" 1-ER-23. Thus, according to the DC, this is "a textbook example of how the use of 'computer records, clerical assistance, and objective criteria' can obviate the need for an evidentiary hearing on each claim." 1-ER-23 (quoting Rubenstein § 4:50). The DC, following a rigorous analysis, was "persuaded that common questions of fact still predominate." 1-ER-23.

Appellants attempt to redefine "independent prescription" by misquoting deposition testimony from Dr. Comanor. Opening.Br.36. But, a careful review of the cited testimony confirms that Dr. Comanor considered an "independent" prescription to be a non-refill—a point he reiterated in his rebuttal report. 3-ER-318–319; 3-ER-221–222. Appellants' effort to impose some other meaning to "independent" misapprehends the record.

Appellants also muse about whether physicians within a practice group might collectively decide to prescribe Actos, rendering their prescription decision for a patient no longer independent. Opening.Br.36–37. This is also a red herring. This is not the definition of "independent" being used to define the class. Moreover, this argument is little more than speculation. Appellants present no

evidence to support a "clustering" of ardent Actos diehards that would have prescribed Actos, "fraud be damned." 1-ER-21. Indeed, such a concept makes little sense. Doctors prescribe a drug to a patient based on the needs of *that* patient, not because they are in some practice group. What matters for this case, is whether the prescription paid for by a TPP was *new*—and, if a TPP paid for five *new* prescriptions of Actos, it is almost a certainty they were injured by the RICO violations.

### C. The District Court Correctly Held that Damages Are Susceptible to Classwide Proof

There are two damages issues. The first is a legal one—whether, as a matter of law, the money spent on RICO-violation-induced Actos prescriptions should be offset by what that money might have been spent on absent the RICO violations. The second is a discretionary one—whether the DC abused its discretion in finding that the proposed damage models met the predominance requirements of class certification.

### 1. Offsetting Damages Is Not Required Under RICO

18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or property by reason of a" RICO violation "shall recover

threefold the damages he sustains[.]"  The statute does not define damages beyond referencing the injury to "business or property[.]"  *See id.*; 18 U.S.C.A. § 1961.  In the first appeal, this Court held that payment for a fraudulently induced Actos prescription constituted an injury in fact.  *See Painters II*, 796 F. App'x at 921, n.1.  However, this Court also suggested that damages could be offset by what the TPP might have had to pay as an alternative to Actos, but ultimately concluded "this is a damages question for another day."  *Painters I*, 943 F.3d at 1251, n.7.  Four years later, that day has come.

The DC concluded that consideration of whether a TPP would have paid for a more expensive alternative is a consideration for damages.  1-ER-24-25.  Appellees respectfully disagree.

It simply makes no sense to define injury or reduce damages in a pharmaceutical quantity-effect RICO claim based on what might have happened to the money in the absence of the RICO violations.  Here, the injury to "business or property" is the fact that money was spent on fraudulently induced Actos prescriptions, *see Painters II*, 796 F. App'x at 921, n.1, and the damages are the amount spent.  Injury and damage should not hinge on the predicted fate of the lost money in the absence

65

of the fraud; whether the TPP kept the money, used it to pay for a different medical intervention, or decided to donate it to charity—in each case there was injury and damage. Put another way, it is not a defense that the money lost to fraud would have been spent, legally, on something else. To hold otherwise would effectively immunize con men, embezzlers, and thieves. They could claim that the victim was not "injured" or sustained "no damages" because, absent the fraud, embezzlement, or theft, the victim would have spent the illegally obtained money on something else. For example, if a person is defrauded into purchasing food, believing it to be kosher, they are still injured and sustained damages even if, absent the fraud, they would have purchased *actual* kosher food, at the same price, from someone else. The buyer would have never purchased the fraudulent food to begin with—even though it is *logical* that they would still need to eat. *See, e.g., F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) ("The seller's misrepresentations tainted the customers' purchasing decisions. … The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds[.]").

Further, the economic equities militate against allowing the

counterfactual "fate of the money" to have a bearing on RICO injury or damages. If, but for the RICO violations, a TPP would have purchased a different medical treatment from a different company, it seems strange that the racketeers, i.e., Takeda and Lilly, would get to keep the value of that alternative treatment, instead of returning what they took. In a real sense, Takeda and Lilly are essentially asking this Court to hold that, even if a RICO violation is fully established, they should be rewarded for that misconduct by keeping any money that would have lawfully gone to someone else. This perverse interpretation runs counter to the liberal construction given to RICO "to effectuate its remedial purposes," which is "nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985). Indeed, "the directly injured party should receive a complete recovery, no matter what," and that recovery should not be tempered by what could have been—it should reflect what actually happened. *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985) ("The fact that the County may have recouped the loss by raising the rate of tax does not defeat its recovery."). As a matter of law, neither RICO injury nor damages

should hinge on whether the money would have been spent, absent the fraud, on some other medical intervention.

### 2. There Is No Abuse of Discretion in the District Court's Finding that Damages Are Susceptible to Classwide Proof, Consistent with Plaintiffs' Theory of Liability

At class certification, "plaintiffs must show that 'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). However, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva*, 716 F.3d at 514.

Plaintiffs presented three estimates of damages. The first model estimated what TPPs paid for those Actos prescriptions that were fraudulently induced by suppression of the bladder cancer risk, accounting for time-specific prices and rebates. 3-ER-230–231, 258; 4-ER-515–517, 537. This estimate reflects the real money lost as a direct result of the RICO violations. Importantly, this model can be applied to

an individual TPP, like Painters, or across the entire class. *See* 4-ER-541–542, 556.

Although Appellees maintain that damages should not be offset, before the DC, they provided a second and third damage model which incorporated an offset. The second model reduced the first model's damages by the time-specific costs of metformin, a therapeutically equivalent OAD. 3-ER 230–231; 3-ER-259; 4-ER-518–520; 4-ER-533–538. The theory is that in estimating the value received from Actos, relative to the money paid, reducing the money spent by the cost of a therapeutically equivalent OAD would reasonably estimate the damage. 3-ER-237–238. The third model reduced the first model's damages by the average time-specific costs of all non-Actos OADs (not just metformin). 3-ER-231–232; 3-ER-260. This reduces damages by the relative value of all therapeutically equivalent OADs at the time of the Actos purchase. The second and third damage models could be applied to any specific TPP, like Painters. 3-ER-261; 4-ER-559.

In considering Plaintiffs' proposed damages model, the DC held that an offset was appropriate in calculating damages. 1-ER-22-25. And, "because class damages can be calculated formulaically in a

69

manner consistent with Plaintiffs' theory of liability, Plaintiffs have met their burden to demonstrate predominance." 1-ER-26 (citing *Comcast*, 569 U.S. at 35 and Rubenstein § 4:54).

Defendants attack the second damages model[7] arguing that use of metformin as an offset "blinks reality" because it assumes everyone that did not take Actos would have taken metformin. Opening.Br.39–41. But that is *not* what the metformin offset represents. Dr. Comanor explained: "I would *not* assume that every patient who would not have taken Actos would instead have switched to a single specific medication." 3-ER-238 (emphasis added). Rather, "the off-set was meant "to account for what a TPP *may* have spent on an alternative[.]" 3-ER-238. He used metformin as a presumptive benchmark, but "[t]his presumption does not mean that every person would in fact have used Metformin had no fraudulent actions occurred. Rather, the cost of Metformin provides a valid proxy to estimate the value received from the Actos purchased for the purposes of calculating damages." 3-ER-238.

---

[7] Appellants do not mention or challenge the third model in their opening brief.

"Although the fact of tort damage must be certain, the amount may rest upon reasonable approximation or inference." *Ukwuoma v. Marine*, 907 F.2d 155 (9th Cir. 1990). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Thus, "[t]he burden of proof as to damages is lower than that for causation, and the factfinder is afforded a greater deal of freedom to estimate damages where the defendant, as here, has created the risk of uncertainty." *Kaiser*, 712 F.3d at 49; *see Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 658 (7th Cir. 2004). "This is why '[e]ven 'speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.'" *Kaiser*, 712 F.3d at 49–50 (quoting *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011)).

Here, assuming an offset is warranted, Dr. Comanor's use of metformin and/or the average cost of all OAD alternatives provides a reasonable approximation to offset the damages sustained by the RICO Class. The jury could consider each model and decide, based on the

evidence, the appropriate damages attributed to the RICO violations—consistent with the quantity-effect theory of liability. The DC's conclusion that predominance was met regarding damages is not an abuse of discretion.

## II. The District Court Correctly Held that a Class Action Is Superior to Thousands of Individual Actions

Appellants argue that the DC's superiority analysis was not "rigorous" because it spanned two paragraphs. Opening.Br.57–59. But, Appellants did not meaningfully challenge superiority. Instead, Appellants hinged their entire superiority challenge on predominance, claiming "numerous individual issues that arise in this case would make a class action completely unmanageable[.]" C.D.Cal.Dkt.247, 33:21–22. Indeed, their entire superiority challenge spanned a single paragraph. The DC, thus, considered their arguments, and held that a longer complicated trial was still superior to thousands of potentially shorter ones. 1-ER-15. ("One supposed 'nightmare' trial is preferable to many hundreds of shorter ones."). Thus, the DC concluded that a "class action form is far superior here." 1-ER-15. When a district court rejects a superiority challenge that repeats predominance concerns, there is no

abuse of discretion. *See Hilario v. Allstate Ins. Co.*, No. 23-15264, 2024 WL 615567, at *2 (9th Cir. Feb. 14, 2024).

Appellants claim that there are potential issues related to unidentified witnesses for TPPs that would make trial unmanageable. But, they provide no *evidence* to support these fears. Plaintiffs, conversely, showed how the *Neurontin* case was able to efficiently manage TPP claims nationally in a class context, *see* 3-SER-378–387, and explained to the DC how the case would be tried, and judgment rendered. C.D.Cal.Dkt. 229, 35:1-36:1. Plaintiffs presented a model for establishing RICO violations, *id.* at 9-11, causation, *id.* at 11-33, and damages using common evidence and modeling, *id.* at 33–35. In agreeing with Plaintiffs, the DC did not reach a conclusion that was "illogical, implausible, or unsupported by the record." *Hilario*, 2024 WL 615567, at *2.

## III. RICO Claims Against Lilly for Engaging in an Enterprise with Takeda Are No Impediment to Class Treatment

Appellants argue that claims against Lilly make class treatment improper because Lilly ceased co-promotion in July 2006. Opening.Br.59–60. However, resolution of Lilly's role in the enterprise

will be resolved using common evidence. Lilly furthered the enterprise by working with Takeda to conceal the bladder cancer risk from day one. *See supra* p.7–10. Lilly's continued concealment of the bladder cancer risk after 2006 allowed continued sales—if Lilly had disclosed what it knew in 2006, Actos sales would have plummeted then. Takeda purchased that silence by providing Lilly royalties for three years *after* the co-promotion ceased—until July 2009. 4-SER-758. If, as Lilly contends, their RICO violations did not cause any TPP to purchase excess Actos after July 2006, then that issue will need to be determined by the trier of fact and it will hinge on *common* Lilly-specific evidence of liability, not individual issues.

## CONCLUSION

The DC's class certification should be affirmed.

Dated: April 4, 2024        Respectfully submitted,

*/s/ R. Brent Wisner*
R. Brent Wisner
Michael L. Baum
Harrison E. James
WISNER BAUM, LLP
11111 Santa Monica Blvd, #1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
mbaum@wisnerbaum.com
hjames@wisnerbaum.com

Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, LLC
1100 Poydras Street, #3525
New Orleans, Louisiana 70163
(504) 355-0086
ccoffin@pbclawfirm.com

*Counsel for Plaintiff-Respondents*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55742

I am the attorney or self-represented party.

**This brief contains** 13,998 **words,** including 59 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ R. Brent Wisner **Date** 4/4/2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                    76                                    *Rev. 12/01/22*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ R. Brent Wisner*
R. Brent Wisner
WISNER BAUM, LLP
11111 Santa Monica Blvd, #1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com